UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

WILLIAM OSTERWEIL,

                             Plaintiff,

                -against-

THE CITY OF NEW YORK, et al.,

                        Defendants.

-------------------------------------------------------------------- x

**DECLARATION OF
DARA L.  WEISS**

**12 CV 1946 (JPO)**

      Dara L. Weiss, an attorney duly admitted to practice in the United States District Court for the Southern District of New York, declares under penalty of perjury and pursuant to 28 U.S.C. §1746 that the following is true and correct:

      1.      I am a Senior Counsel in the office of MICHAEL A. CARDOZO, Corporation Counsel of the City of New York, attorney for defendant City of New York.

      2.      I am familiar with the facts and circumstances stated herein based upon personal knowledge and the books and records of the City of New York.  I submit this declaration in support of defendant City of New York's motion for sanctions against plaintiff William Osterweil and/or his counsel pursuant to Rule 11 of the Federal Rules of Civil Procedure, and the inherent power of the court.  This declaration is also to place the pertinent records before this Court.

      3.      Annexed hereto as Exhibit "A" is a true and correct copy of the complaint, which was filed by plaintiff William Osterweil in the Supreme Court, New York County on February 14, 2012, and removed to the United States District Court, Southern District of New York on or about March 15, 2012, wherein plaintiff alleges that his federal constitutional rights were violated on October 1, 2011.

4.      Annexed hereto as Exhibit "B" is a true and correct copy of defendants' letter to Vik Pawar, Esq. dated March 27, 2012, wherein defendants provided plaintiff safe harbor to voluntarily withdraw the complaint against defendants.

5.      Annexed hereto as Exhibit "C" is a true and correct copy of plaintiff's story entitled "The Battle of the Brooklyn Bridge" posted to website sharable.net on October 4, 2011.

6.      Annexed hereto as Exhibit "D" is a true and correct copy of defendants' letter to Gideon Orion Oliver, Esq. dated May 14, 2012, wherein defendants provided plaintiff safe harbor to voluntarily withdraw the complaint against defendants.


Dated: June 28, 2012
New York, New York


                                                    _____/s/_____
                                                              Dara L. Weiss
                                                              Senior Counsel

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Index No. _____

----------------------------------------------------------------X

Date Filed: _____

WILLIAM OSTERWEIL,

                           Plaintiff,

**COMPLAINT**

                -against-

THE CITY OF NEW YORK, LT. STEPHEN
LATALARDO, P.O. JEFFREY GALVIN and
JOHN DOEs #1-2,

                       Defendants.

----------------------------------------------------------------X

NEW YORK
COUNTY CLERK'S OFFICE

FEB 14 2012

NOT COMPARED
WITH COPY

       Plaintiff WILLIAM OSTERWEIL through his counsel, for his complaint, states the following upon information and belief:

## PARTIES

    1.    Plaintiff WILLIAM OSTERWEIL is an individual who resides in Brooklyn, Kings County, State of New York..

    2.    Defendant THE CITY OF NEW YORK (hereinafter "CITY") is a municipal corporation organized under the laws of the State of New York, in and as the City of New York.

    3.    Defendants Galvin and Latalardo are individuals whose residences are unknown to Plaintiff.

    4.    Defendant JOHN DOEs # 1-2  are New York City police officer whose names and addresses are presently unknown to Plaintiff.

2

## PREREQUISITES TO SUIT AGAINST THE CITY OF NEW YORK

6.      Plaintiff has served a timely notice of claims upon Defendant CITY within 90 days after Plaintiff was falsely arrested and detained, as described in this complaint.

7.      At least 30 days have elapsed since the service of such notice of claim and that adjustment or payment thereof has been neglected or refused.

8.      Plaintiff has duly complied with all of the conditions precedent to the commencement of this action.

9.      This action complies with all statutory requirements for timeliness.

## FACTS

10.      Plaintiff is a magna cum laude graduate of Cornell University and has no prior arrest record.

11.      On October 1, 2011 around 3 pm, plaintiff was walking from his home in Brooklyn towards Manhattan on the Brooklyn Bridge in the area designated for pedestrians.

12.      On October 1, 2011, the individual defendants and JOHN DOEs # 1-2 were New York City Police officers (all collectively will be hereinafter referred to as "Defendant Police Officers.")

13.      On the above date while plaintiff was walking he was arrested alongwith other arrestees who were purpotedly part of the Occupy Wall Street protest group. Plaintiff was not part of this group but yet the defendants arrested him for lawfully being on the pedestrian walkway of the Brooklyn Bridge.

14.      A reasonable person or police officer should have known that Plaintiff had committed no crime.

15.     Defendant Police Officers had no warrant arrest Plaintiff.

16.     Defendant Police Officers otherwise had not other lawful reasons to arrest Plaintiff.

17.     Notwithstanding, Defendant Police Officers arrested and handcuffed Plaintiff.

18.     Prior to being handcuffed, Plaintiff attempted to inform Defendant Police Officers that he had committed no crime and that he did not want be handcuffed and go to jail, but Plaintiff went peacefully and submitted without resistance to the false arrest.

19.     Upon arrival at the jail, Plaintiff was subjected to a humiliating search and was deprived of all money and personal belongings.

20.     Plaintiff was then incarcerated in a cell with criminals.

21.     Plaintiff was also subject to humiliation and suffered mental anguish, annoyance, and inconvenience from being arrested, handcuffed, and incarcerated in jail for the first time in his life.

22.     Eventually, Plaintiff was released from jail after about 15 hours in custody and after being finger-printed and processed through the system.

23.     After being released from jail, a criminal proceeding was brought against Plaintiff titled People of the State of New York v. William Osterweil in the Criminal Court of the City of New York, New York County, under docket number 2011NY080166.

24.     As a result of this criminal complaint, Plaintiff had to appear publicly as a criminal defendant in court several times.

25.     At his first appearance, plaintiff was released on his own recogninance.

4

26.     Plaintiff appeared at all subsequent proceedings.

27.     Finally on January 11, 2012 because the charges in the criminal proceeding had no merit, all charges against Plaintiff (who was a criminal defendant at the time) were dismissed at a later date on the motion of the District Attorney's Office who acknowledged that they could not prove beyond a reasonable doubt that plaintiff had committed the offense that he was charged with.

## FIRST CAUSE OF ACTION
### (Violation of 42 U.S.C § 1983)

28.     Plaintiff repeats and re-alleges every allegation in this complaint.

29.     Defendant Police Officers intended to confine and completely confined Plaintiff.

30.     Plaintiff was cognizant of the confinement.

31.     Plaintiff voiced strenuous objections to the confinement in which he did not consent.

32.     Defendant Police Officers were not justified, privileged, or provoked into confining Plaintiff in any way.

33.     Defendant Police Officers acted under color of law as is defined in 42 U.S.C. § 1983 in confining and incarcerating Plaintiff and in violating Plaintiff's rights secured under the 4th and 14th amendments.

34.     Defendant Police Officers violated Plaintiff's civil liberties and rights under the United State Constitution, including, but not limited to, the Bill of Rights, and rights under the New York State Constitution.

35.     Pursuant to 42 U.S.C. § 1983, Plaintiff is entitled to damages from Defendant Police Officers for violations of Plaintiff's constitutionally protected civil

rights.

36.    Defendant CITY has maintained a system of review of police conduct that is so untimely and cursory as to be ineffective and has a policy to permit and tolerate the unreasonable and excessive use of force and lack of discretion in making arrests by police officers.

37.    The acts, omissions, systemic flaws, policies, and customs of Defendant CITY caused Defendant Police Officers to believe that the excessive and unreasonable use of force and falsely arresting individuals, such as Plaintiff based upon, among other things, racial motives, would not be aggressively, honestly, and properly investigated, with the foreseeable result that officers are more likely to use excessive or unreasonable force and against Plaintiff and in falsely arresting Plaintiff and others in the future.

38.    Consequently, pursuant to 42 U.S.C. § 1983, Plaintiff is also entitled to damages from Defendant CITY for violations of Plaintiff's constitutionally protected civil rights against.

39.    Finally, all Defendants are liable for paying Plaintiff an award of counsel fees in an amount to be determined by this court pursuant to 42 U.S.C. § 1988.

### SECOND CAUSE OF ACTION
### (False arrest/imprisonment)

40.    Plaintiff repeats and re-alleges every allegation in this complaint.

41.    Defendant Police Officers intended to confine and completely confined Plaintiff.

42.    Plaintiff was cognizant of the confinement.

43.    Plaintiff voiced strenuous objections to the confinement in which he did not consent.

44.    Defendant Police Officers were not justified, privileged, or provoked into confining Plaintiff.

45.    Defendant Police Officers acted within the scope of their duties as police officers for the CITY and in the interest of the CITY when they confined and falsely arrested and imprisoned Plaintiff.

46.    Defendant CITY is, therefore, vicariously liable for falsely arresting and imprisoning Plaintiff.

47.    Thus, all Defendants are liable for falsely arresting and imprisoning Plaintiff.

## THIRD CAUSE OF ACTION
### (Battery)

48.    Plaintiff repeats and re-alleges every allegation in this complaint.

49.    Defendant Police Officers' acts were intentional.

50.    Defendant Police Officers' conduct resulted in harmful, offensive, and nonconsensual bodily contact with the Plaintiff amounting to the civil tort of battery.

51.    Defendant Police Officers acted within the scope of their duties as police officers for the CITY and in the interest of the CITY when they battered Plaintiff.

52.    Defendant CITY is, therefore, vicariously liable for the battery that Defendant police officers inflicted upon Plaintiff.

53.    Thus, all Defendants are liable for the tort of battery.

## FOURTH CAUSE OF ACTION
### (Negligence)

54.    Plaintiff repeats and re-alleges every allegation in this complaint.

55.    Defendant Police Officers had a duty to protect and not arrest citizens who

7

commit no crime.

56.    Defendant Police Officers breached that duty by failing to exercise reasonable care and judgment in determining whether to arrest Plaintiff.

57.    The actions of Defendant Police Officers caused Plaintiff to suffer damages.

58.    Consequently, Defendant Police Officers are liable for negligence.

59.    Defendant Police Officers acted within the scope of their duties as police officers for Defendant CITY and in the interest of the CITY when they arrested Plaintiff.

60.    Defendant CITY is, therefore, vicariously liable for the actions of Defendant Police Officers, who acted within their scope of employment as police officers.

61.    Thus, all Defendants are liable for negligence.

### FIFTH CAUSE OF ACTION
### (Negligent Hiring and Retention)

62.    Plaintiff repeats and re-alleges every allegation in this complaint.

63.    Defendant CITY had a duty to hire and retain competent police officers.

64.    Defendant CITY knew, or should have known, that Defendant Police Officers were unfit to be hired and retained as police officers of the New York City Police Department.

65.    Defendant CITY breached its duty to hire and retain competent police officers.

66.    As a result of the CITY's breach, the Plaintiff suffered damages.

67.    Thus, Defendant CITY is liable for negligent hiring and retention of Defendant police officers.

## SIXTH CAUSE OF ACTION
### (Defamation)

68.    Plaintiff repeats and re-alleges every allegation in this complaint.

69.    Defendant Police Officers printed and/or uttered false and injurious statements concerning Plaintiff.

70.    The false statements accused Plaintiff of having committed crime(s).

71.    Defendant Police Officers published these false statements to third-parties.

72.    Defendant Police Officers wrote and/or spoke the statements with malice, recklessness, negligence, and gross negligence.

73.    Thus, Defendant Police Officers are liable for defamation per se.

74.    Defendant Police Officers acted within the scope of their duties as police officers for   Defendant CITY and in the interest of  the CITY when they defamed Plaintiff.

75.    Defendant CITY is, therefore, vicariously liable for the defamation that Defendant Police Officers committed.

76.    Thus, all Defendants are liable for defamation per se.

## SEVENTH CAUSE OF ACTION
### (Malicious Prosecution)

77.    Plaintiff repeats and re-alleges every allegation in this complaint.

78.    Defendants brought a prior criminal proceeding against Plaintiff.

79.    The prior criminal proceedings terminated in favor of Plaintiff (where Plaintiff was named a criminal defendant).

80.    Defendant Police Officers lacked probable cause to handcuff, arrest, imprison, and prosecute Plaintiff.

81.    Defendant Police Officers had malice in prosecuting Plaintiff in the prior criminal proceedings.

82.    Defendant CITY is vicariously liable for the actions of Defendant Police Officers, who acted within their scope of employment as New York City police officers.

83.    Thus, all Defendants are liable for malicious prosecution.

**WHEREFORE**, Plaintiff demands judgment as follows:

(a)    on the First Cause of Action (42 U.S.C § 1983), actual and punitive damages in the amount of $250,000.00 and, pursuant to 42 U.S.C. § 1988, attorney's fees against all Defendants;

(b)    on the Second Cause of Action (False arrest/imprisonment), actual and punitive damages in the amount of $250,000.00 against all Defendants;

(c)    on the Third Cause of Action (Battery), actual and punitive damages in the amount of $250,000.00 against all Defendants;

(d)    on the Fourth Cause of Action (Negligence), actual damages in the amount of $250,000.00 against all Defendants;

(e)    on the Fifth Cause of Action (Negligent Hiring and Retention), actual damages in the amount of $250,000.00 against Defendant CITY;

(f)    on the Sixth Cause of Action (defamation), actual and punitive damages in the amount of $250,000.00 against Defendant CITY;

(g)    on the Seventh Cause of Action (malicious prosecution), actual and punitive damages in the amount of $250,000.00; and

(h)    costs, disbursements, interest, and such other relief that is appropriate.

Dated:    New York, New York
          February  6  , 2012

By: _____
    Vikrant Pawar
    Attorney for Plaintiff
    30 Vesey Street, Suite 900
    New York, New York 10007
    (212) 571-2266

# EXHIBIT B



MICHAEL A. CARDOZO
*Corporation Counsel*

### THE CITY OF NEW YORK
## LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007

DARA L. WEISS
Senior Counsel
*E-mail: daweiss@law.nyc.gov*
*Phone: (212)788-1309*
*Fax: (212) 788-9776*

March 21, 2012

Vikrant Pawar
30 Vesey Street, Suite 900
New York, NY 10007

Re:     *William Osterweil  v. The City of New York, et al.*
         12 Civ. 1946 (JPO)

Dear Mr. Pawar:

        I am a Senior Counsel in the Office of Michael A. Cardozo, Corporation Counsel of the City of New York, and the attorney assigned to the defense of the above referenced matter. I write pursuant to Rules 11(b)(3) and 11(c)(1) of the Federal Rules of Civil Procedure, to allow plaintiff William Osterweil an opportunity to withdraw his complaint against defendant City of New York ("City"), Lt. Stephen Latalardo and P.O. Jeffrey Galvin or to otherwise respond to this letter by April 11, 2012, with plaintiff's good faith explanation as to why the matter should not be withdrawn. If plaintiff fails to do so, defendant City intends to move the Court to impose sanctions and costs pursuant to Rule 11(c)(2) for the reasons set forth below.


        A pleading violates Rule 11 where "after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or good faith argument for the extension, modification or reversal of existing law." Jacques v. Dimarzio, 216 F. Supp. 2d 139, 143 (E.D.N.Y. 2002)(citations omitted); FED. R. CIV. P. 11(b). "Since the inquiry must be reasonable under the circumstances, liability for Rule 11 violations requires only a showing of objective unreasonableness on the part of the attorney or client signing the papers." ATSI Communs., Inc. v. Shaar Fund, Ltd., 579 F.3d 143, 150 (2d Cir. 2009) (internal quotations omitted); see also Mover's & Warehouseman's Ass'n of Greater New York v. Long Island Moving & Storage Ass'n Inc., et al., 98 Civ. 5373, 1999 U.S. Dist. LEXIS 20667, at *24 (E.D.N.Y. Dec. 27, 1999) (declaring that, when it is objectively obvious that plaintiff's counsel engaged in little or no preliminary factual and legal investigation before filing a pleading, sanctions are warranted). Bad faith on the attorney's part is not a necessary element for the imposition of sanctions and costs. Id. Notably, "[a] statement of fact can give rise to the imposition of sanctions only when the particular allegation is utterly lacking in support." Kiobel v. Millson, 592 F.3d 78, 81 (2d Cir. 2010) (internal quotations omitted).

Here, plaintiff asserts a number of claims arising out of his arrest on October 1, 2011 on the Brooklyn Bridge.  Plaintiff claims in paragraph 11 of the complaint that on October 1, 2011 at approximately 3 p.m. he was "walking from his home in Brooklyn towards Manhattan on the Brooklyn Bridge in the area designated for pedestrians."  He further alleges in paragraph 13 of the complaint that he was "arrested alongwith (sic) other arrestees who were purportedly part of the Occupy Wall Street protest group" and he "was not part of this group but yet the defendants arrested him for lawfully being on the pedestrian walkway of the Brooklyn Bridge." A simple Google search of plaintiff's name brings up a document authored by plaintiff just days after the incident, at http://www.shareable.net/blog/the-battle-of-brooklyn-bridge, a copy of which is annexed hereto.  In said post, plaintiff writes about the October 1, 201 Brooklyn Bridge march, "In the roadbed, filling the Brooklyn bound lane with traffic, we screamed and jumped and took in the view. And not the view from the narrow, raised central walkway, where there isn't nearly enough room for the tourists and bikers to coexist, where recently ten-foot high metal construction barriers have blocked the skyline. We were right up against the edge." Plaintiff further writes about "Those of us running up the Brooklyn Bridge, those of us who for one glorious hour held it, occupied it with 1000 of our closest friends." This post belies the allegation that plaintiff was "on the pedestrian walkway" and that he "was not part of the group."

Had counsel for planitff conducted a reasonable investigation, he would have learned that the "facts" as recited in the complaint are clearly spurious, and plaintiff in fact admitted he was part of the group that "took the bridge" by walking on the roadway of the Brooklyn Bridge on October 1, 2011, despite hearing warnings given by a police lieutenant, announcing protesters' imminent arrest if they didn't clear the road, which were ignored.

In view of the foregoing, plaintiff's claims are not factually viable.  Consequently, the City of New York requests that plaintiff voluntarily withdraw his complaint, or otherwise respond to this letter, by April 11, 2012.  If plaintiff fails to do so, the City intends to move for sanctions and costs under Rule 11 for failing to conduct an objectively reasonable inquiry concerning the allegations in the complaint.

Very truly yours,

Dara L. Weiss
Senior Counsel
Special Federal Litigation Division

Attachment

REGISTER FOR FREE! / LOGIN

# :CITIES

MOST RECENT     TOP TAGS:   VIDEOS   DIY   HOW TO SHARE   FEATURES   COLLABORATIVE CONSUMPTION   COMMONS   SHARING

## The Battle of Brooklyn Bridge

 By Willie Osterweil
10.04.11, 12:23pm | Comments (1)   Like  37   Tweet  22

Select Language

**RELATED ARTICLES**

- You're Invited to SHARE New York
- Occupy as a New Societal Model & Ways To Improve It
- Policies for a Shareable City
- Occupy Wall Street's Consensus Process [VIDEO]
- More Than Books: Libraries Strengthen Communities in Uncertain Times
- Authors, Publishers and Supporters React to the Seizure of the People's Library
- Policies for a Shareable City #1: Car Sharing and Parking Sharing
- Louisville on My Mind
- Recap From SHARE NY
- How to Be an Urban Change Agent, Shareable Style

 **How Can We Practice Sharing, Organizing, and Creating in Ways That Transform Ourselves, Our Communities, and the World?**
By Caroline Woolard

 **Speed Neighboring: One Way To Repel The Attack On Sharing**
By Randy White

 **Bibliophiles**
By Heather Villa

 **Build a New Economy for the Cost of a Coffee? Pt. 2**
By Drew Little

 **Trade School: Pay Teachers with Groceries, Art & Advice**
By Caroline Woolard

 **Transplant**
By Heather Villa

 **Build a New Economy for the Cost of a Coffee? Pt. 1**
By Drew Little

 **Differentiating The Anarchy Economy From The Sharing Economy**
By Randy White

 **Cultivating a Sustainable Community: The Cycle of Collaboration**
By Brad Smith and Barbara Wishingrad

 **A Collaborative Economy in a Centralized Country?**
By Shabnam Anvar



(via wikimedia)

"Whose Bridge?" "Our Bridge!" "Whose Bridge?" "Our Bridge!"

For one hour on Saturday, the bridge belonged to the people. 1000 protesters spilled over its roadway while another 1000 marched across the pedestrian walkway. In the roadbed, filling the Brooklyn bound lane with traffic, we screamed and jumped and took in the view. And not the view from the narrow, raised central walkway, where there isn't nearly enough room for the tourists and bikers to coexist, where recently ten-foot high metal construction barriers have blocked the skyline. We were right up against the edge.

For the next four hours on Saturday, the bridge belonged to the NYPD. Setting a line of police vehicles and orange netting at the center of the bridge, and coming up behind us with patrol vans and paddy wagons, they kettled us. Some protesters, quick enough and closer to the center, scaled the bridge posts onto the safety of the walkway ten feet above, but cops soon pushed through the northeast side of the lane, separating us from escape. One by one, violently at first, then, as the reality of our position became clear, smoothly, they arrested us. The NYPD spent four hours arresting 700-plus people.

We were put in plastic cuffs and sat down behind the police barricades, where an "arresting officer" was assigned to every five protesters – from then on we would be transported and processed in groups of five, getting in and out of jail at the same time, a little sub-unit of solidarity. Some of us were put in police vans and buses, but most were transported, like I was, in requisitioned MTA buses. Ours was a B41, which normally runs right by my apartment, driven by an MTA bus driver—a coerced union transportation worker, not a cop—who said while we rolled out: "It feels like the 60's again!" to raucous applause. Arms aching restrained behind us, sitting on the hard plastic seats, cops standing over us looking bored, with our eyes at their waists, looking at their guns and pepper spray, this was the commute *par excellence*.

There is no single precinct jail with capacity for 700 prisoners, so protesters were spread in jails across Manhattan and Brooklyn. The buses functioned as holding cells while the police prepared intake- mobile arrest pens where we sat for hours needing to pee and stretch our arms and legs—but for most of us that was the worst of it. "Arresting officers" didn't get to leave until "their" five arrestees were processed, so we sat in jail talking, chanting, singing, sleeping, or staring sullenly at our feet while they filled out paperwork until two, three, four in the morning. Those of us with ID and without warrants were given a Bench Summons for Disorderly Conduct and released the same night- those without ID were released throughout the day Sunday. Though a couple

- In regards to citations for 20 min 21 sec ago
- I mean pushing forward in 1 hour 29 min ago
- Hi Andrew, I should have read

protesters with outstanding warrants stayed longer, many protesters with, shall
we say, pressing legal issues got through unscathed. We overwhelmed them:
the cops just didn't have the capacity to properly sort us. Charges would've
been disastrous, but there were too many, and as a result, barely any
misdemeanor charges (let alone felonies).

But for all that happened, the stories parsing the meaning of Saturday's events
have focused around one ten-minute stretch: the moment at which people
deviated from the pre-planned route across the pedestrian walk and took the
roadway. Two stories are being told. Story one claims that the police instigated
and tricked protesters onto the road, luring them with a combination of
obviously weak policing and agent provocateurs in order to entrap and arrest
them. The idea that cops led protesters onto the bridge has largely been
supported by this video, which shows police walking ahead of protesters as
they enter the onramp, and has been interpreted as cops leading the march.

Story two has the protesters stop their march at the base of the on-ramp to
make a choice. The police warn them to get out of the road, but a group of
protesters in the front decide to link arms and take the bridge anyway. The
lieutenants, not expecting this radical action, back off, and protesters march
onto the bridge with cops fleeing ahead of them. This argument has been
supported by this video, in which a lieutenant, announcing protesters'
immanent arrest if they don't clear the road, is ignored and drowned out by
marchers' cries.



In story one, the NYPD are brilliant tacticians, controlling and understanding
the protesters perfectly. Despite this total knowledge, however, they are so
filled with spite for the protesters that they are willing to shut down the Brooklyn
Bridge for five hours in order to arrest them, resulting media coverage be
damned. They're supposedly both super-villain brilliant and obsessively idiotic.
In story two, the police are unprepared and overwhelmed. Expecting the
protesters to cross legally, the majority of the police force was amassed on the
Brooklyn side. When protesters took the bridge, the Brass panicked and locked
down the bridge. They arrested everyone, believing it better than appearing
unable to control the situation, revealing themselves as reactive, arrogant, and
tactically mediocre.

In the first story, the protesters are foolish, misled and chaotic, unable to
recognize that they're being led by the police to certain arrest. Idealistic but
stupid, fatally infiltrated by provocateurs, they bumble away from the planned
peaceful march into disaster. Despite their total idiocy, this narrative maintains
that these innocents are the very center of the police's universe, the total focus
of their actions. In story two, the protesters recognize their own strength, the
power-and-attention-amplifying value of disrupting infrastructure and the
potential fun of occupying the bridge. They overcome their fear of the police
and their fear of the impossible, and seize their own freedom, even if just for an
hour.

The protesters should clearly be telling story two, and not just because it's what
actually happened. But instead, they've mostly told the former. Why? The
generous explanation is a knee-jerk dismissal of mainstream media and police
narratives, which is certainly present, but there are worse motives for the
propagation of the cop-control story. Politically repressive or vanguardist,
power hungry or critically feeble: despite all disavowal, power has centralized
around certain figures within Occupy Wall Street's committees, and when

2 hours 10 min ago
• As the Obama administration
2 hours 27 min ago
• Neal, thanks for weighing in.
2 hours 46 min ago

more

power centralizes, its bureaucrats always try to hold onto it. So organizers blame the other side, albeit with a blatantly bizarre explanation (The cops really wanted to shut down the Brooklyn Bridge and arrest 700 people? Their whole job is to keep infrastructure functioning.) Organizers, upset over the loss of control of the march and behaving identically to police upset over loss of control of the bridge, blame the other side. Each side argues that their own weakness took the day.

Those of us running up the Brooklyn Bridge, those of us who for one glorious hour held it, occupied it with 1000 of our closest friends, we weren't manipulated by police: we just decided we'd take a walk on the bridge. Everyone focuses on the arrests, on the drama, but most people fail to mention just how easy it is to take something over when there are 700 of you. 1000 people can walk anywhere they want, and, if they do it right, do anything they please. It's when the cops are trying and failing to arrest 1000 of us that things are going to get really interesting.

TAGS: OCCUPY WALL STREET, VIDEOS

 37     22     4

Rate this article

Your rating: None Average: 4 (4 votes)

| We Recommend | From around the web |
|---|---|
| Is Happiness The New Online Currency? | The 30 Most Unforgivable Betrayals in Sports (BleacherReport) |
| SXSW Liveblog: The Airbnb of Anything: The Growth of P2P Markets | Say Goodbye to Fast Ethernet (CIO) |
| Dog Parks, Humans and the Commons | SSDs Have 'Bleak' Future, Researchers Say (PC World) |
| Speed Neighboring: One Way To Repel The Attack On Sharing | Increase a home network's speed (Computer Active) |
| Occupy The War Machine | Honda Accord Reviews | New Honda Accord 2.0 (Auto Express) |

[?]

## Comments

 **Samuel Greenlee** wrote on 10.05.11, 9:16am :

Willie,
I appreciate your thoughtfulness on this issue and your resistance to new forms of bureaucratic corruption, even among protesters. Could you please do a follow-up, though, explaining the reasoning behind the protest on the bridge? I don't understand the reasoning behind shutting down an important traffic artery and causing a headache for the people (most of whom would not have been Wall Street fat-cats) trying to get home or to work as a protest against corporate greed and corruption.
Thanks,
Sam

-Sam
http://leakyjar.wordpress.com
@SamuelGreenlee

# EXHIBIT C

REGISTER FOR FREE! / LOGIN

# :CITIES



## The Battle of Brooklyn Bridge

 By Willie Osterweil
10.04.11, 12:23pm | Comments (1)     Like   37    Tweet   22

Select Language ▼





(via wikimedia)

"Whose Bridge?" "Our Bridge!" "Whose Bridge?" "Our Bridge!"

For one hour on Saturday, the bridge belonged to the people. 1000 protesters spilled over its roadway while another 1000 marched across the pedestrian walkway. In the roadbed, filling the Brooklyn bound lane with traffic, we screamed and jumped and took in the view. And not the view from the narrow, raised central walkway, where there isn't nearly enough room for the tourists and bikers to coexist, where recently ten-foot high metal construction barriers have blocked the skyline. We were right up against the edge.

For the next four hours on Saturday, the bridge belonged to the NYPD. Setting a line of police vehicles and orange netting at the center of the bridge, and coming up behind us with patrol vans and paddy wagons, they kettled us. Some protesters, quick enough and closer to the center, scaled the bridge posts onto the safety of the walkway ten feet above, but cops soon pushed through the northeast side of the lane, separating us from escape. One by one, violently at first, then, as the reality of our position became clear, smoothly, they arrested us. The NYPD spent four hours arresting 700-plus people.

We were put in plastic cuffs and sat down behind the police barricades, where an "arresting officer" was assigned to every five protesters -- from then on we would be transported and processed in groups of five, getting in and out of jail at the same time, a little sub-unit of solidarity. Some of us were put in police vans and buses, but most were transported, like I was, in requisitioned MTA buses. Ours was a B41, which normally runs right by my apartment, driven by an MTA bus driver—a coerced union transportation worker, not a cop—who said while we rolled out: "It feels like the 60's again!" to raucous applause. Arms aching restrained behind us, sitting on the hard plastic seats, cops standing over us looking bored, with our eyes at their waists, looking at their guns and pepper spray, this was the commute *par excellence*.

There is no single precinct jail with capacity for 700 prisoners, so protesters were spread in jails across Manhattan and Brooklyn. The buses functioned as holding cells while the police prepared intake- mobile arrest pens where we sat for hours needing to pee and stretch our arms and legs—but for most of us that was the worst of it. "Arresting officers" didn't get to leave until "their" five arrestees were processed, so we sat in jail talking, chanting, singing, sleeping, or staring sullenly at our feet while they filled out paperwork until two, three, four in the morning. Those of us with ID and without warrants were given a Bench Summons for Disorderly Conduct and released the same night- those without ID were released throughout the day Sunday. Though a couple

### RELATED ARTICLES

- **You're Invited to SHARE New York**
- Occupy as a New Societal Model & Ways To Improve It
- Policies for a Shareable City
- Occupy Wall Street's Consensus Process [VIDEO]
- More Than Books: Libraries Strengthen Communities in Uncertain Times
- Authors, Publishers and Supporters React to the Seizure of the People's Library
- Policies for a Shareable City #1: Car Sharing and Parking Sharing
- Louisville on My Mind
- Recap From SHARE NY
- How to Be an Urban Change Agent, Shareable Style

 **How Can We Practice Sharing, Organizing, and Creating in Ways That Transform Ourselves, Our Communities, and the World?**
- By Caroline Woolard

 **Speed Neighboring: One Way To Repel The Attack On Sharing**
- By Randy White

 **Bibliophiles**
By Heather Villa

 **Build a New Economy for the Cost of a Coffee? Pt. 2**
- By Drew Little

 **Trade School: Pay Teachers with Groceries, Art & Advice**
- By Caroline Woolard

 **Transplant**
By Heather Villa

 **Build a New Economy for the Cost of a Coffee? Pt. 1**
- By Drew Little

 **Differentiating The Anarchy Economy From The Sharing Economy**
- By Randy White

 **Cultivating a Sustainable Community: The Cycle of Collaboration**
By Brad Smith and Barbara Wishingrad

 **A Collaborative Economy in a Centralized Country?**
- By Shaanam Anvar

- In regards to citations for 20 min 21 sec ago
- I mean pushing for war in 1 hour 29 min ago
- Hi Andrew, I should have read



protesters with outstanding warrants stayed longer, many protesters with, shall
we say, pressing legal issues got through unscathed. We overwhelmed them:
the cops just didn't have the capacity to properly sort us. Charges would've
been disastrous, but there were too many, and as a result, barely any
misdemeanor charges (let alone felonies).

But for all that happened, the stories parsing the meaning of Saturday's events
have focused around one ten-minute stretch: the moment at which people
deviated from the pre-planned route across the pedestrian walk and took the
roadway. Two stories are being told. Story one claims that the police instigated
and tricked protesters onto the road, luring them with a combination of
obviously weak policing and agent provocateurs in order to entrap and arrest
them. The idea that cops led protesters onto the bridge has largely been
supported by this video, which shows police walking ahead of protesters as
they enter the onramp, and has been interpreted as cops leading the march.

Story two has the protesters stop their march at the base of the on-ramp to
make a choice. The police warn them to get out of the road, but a group of
protesters in the front decide to link arms and take the bridge anyway. The
lieutenants, not expecting this radical action, back off, and protesters march
onto the bridge with cops fleeing ahead of them. This argument has been
supported by this video, in which a lieutenant, announcing protesters'
immanent arrest if they don't clear the road, is ignored and drowned out by
marchers' cries.



City Room: N.Y.P.D. Video of Occupy Wall Street...

In story one, the NYPD are brilliant tacticians, controlling and understanding
the protesters perfectly. Despite this total knowledge, however, they are so
filled with spite for the protesters that they are willing to shut down the Brooklyn
Bridge for five hours in order to arrest them, resulting media coverage be
damned. They're supposedly both super-villain brilliant and obsessively idiotic.
In story two, the police are unprepared and overwhelmed. Expecting the
protesters to cross legally, the majority of the police force was amassed on the
Brooklyn side. When protesters took the bridge, the Brass panicked and locked
down the bridge. They arrested everyone, believing it better than appearing
unable to control the situation, revealing themselves as reactive, arrogant, and
tactically mediocre.

In the first story, the protesters are foolish, misled and chaotic, unable to
recognize that they're being led by the police to certain arrest. Idealistic but
stupid, fatally infiltrated by provocateurs, they bumble away from the planned
peaceful march into disaster. Despite their total idiocy, this narrative maintains
that these innocents are the very center of the police's universe, the total focus
of their actions. In story two, the protesters recognize their own strength, the
power-and-attention-amplifying value of disrupting infrastructure and the
potential fun of occupying the bridge. They overcome their fear of the police
and their fear of the impossible, and seize their own freedom, even if just for an
hour.

The protesters should clearly be telling story two, and not just because it's what
actually happened. But instead, they've mostly told the former. Why? The
generous explanation is a knee-jerk dismissal of mainstream media and police
narratives, which is certainly present, but there are worse motives for the
propagation of the cop-control story. Politically repressive or vanguardist,
power hungry or critically feeble: despite all disavowal, power has centralized
around certain figures within Occupy Wall Street's committees, and when

2 hours 10 min ago
• As the Obama administration
  2 hours 27 min ago
• Neal, thanks for weighing in.
  2 hours 46 min ago

more



power centralizes, its bureaucrats always try to hold onto it. So organizers blame the other side, albeit with a blatantly bizarre explanation (The cops really wanted to shut down the Brooklyn Bridge and arrest 700 people? Their whole job is to keep infrastructure functioning.) Organizers, upset over the loss of control of the march and behaving identically to police upset over loss of control of the bridge, blame the other side. Each side argues that their own weakness took the day.

Those of us running up the Brooklyn Bridge, those of us who for one glorious hour held it, occupied it with 1000 of our closest friends, we weren't manipulated by police: we just decided we'd take a walk on the bridge. Everyone focuses on the arrests, on the drama, but most people fail to mention just how easy it is to take something over when there are 700 of you. 1000 people can walk anywhere they want, and, if they do it right, do anything they please. It's when the cops are trying and failing to arrest 1000 of us that things are going to get really interesting.

TAGS: OCCUPY WALL STREET, VIDEOS

 Like 37    Tweet 22    4

Rate this article

Your rating: None Average: 4 (4 votes)

## We Recommend

Is Happiness The New Online Currency?

SXSW Liveblog: The Airbnb of Anything; The Growth of P2P Markets

Dog Parks, Humans and the Commons

Speed Neighboring: One Way To Repel The Attack On Sharing

Occupy The War Machine

## From around the web

The 30 Most Unforgivable Betrayals in Sports (BleacherReport)

Say Goodbye to Fast Ethernet (CIO)

SSDs Have 'Bleak' Future, Researchers Say (PC World)

Increase a home network's speed (Computer Active)

Honda Accord Reviews | New Honda Accord 2.0 (Auto Express)

[?]

## Comments

 **Samuel Greenlee** wrote on 10.05.11, 8:18am:

Willie,
I appreciate your thoughtfulness on this issue and your resistance to new forms of bureaucratic corruption, even among protesters. Could you please do a follow-up, though, explaining the reasoning behind the protest on the bridge? I don't understand the reasoning behind shutting down an important traffic artery and causing a headache for the people (most of whom would not have been Wall Street fat-cats) trying to get home or to work as a protest against corporate greed and corruption.
Thanks,
Sam

-Sam
http://leakyjar.wordpress.com
@SamuelGreenlee

EXHIBIT D



MICHAEL A. CARDOZO
*Corporation Counsel*

### THE CITY OF NEW YORK
# LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007

DARA L. WEISS
Senior Counsel
*E-mail: daweiss@law.nyc.gov*
*Phone: (212)788-1309*
*Fax: (212) 788-9776*

May 14, 2012

**BY EMAIL AND FIRST CLASS MAIL**
Gideon Oliver, Esq.
200 East 10th Street #917
New York, NY  10003-7702

       Re:    *William Osterweil  v. The City of New York, et al.*
              12 Civ. 1946 (JPO)

Dear Mr. Oliver:

       I am a Senior Counsel in the Office of Michael A. Cardozo, Corporation Counsel of the City of New York, and the attorney assigned to the defense of the above referenced matter. On March 27, 2012, I wrote to plaintiff's former counsel, Vik Pawar, pursuant to Rules 11(b)(3) and 11(c)(1) of the Federal Rules of Civil Procedure, to allow plaintiff William Osterweil an opportunity to withdraw his complaint against defendant City of New York ("City"), Lt. Stephen Latalardo and P.O. Jeffrey Galvin or to otherwise respond by April 17, 2012, with plaintiff's good faith explanation as to why the matter should not be withdrawn. Mr. Pawar represented to me that upon learning the information provided in that letter, that he would seek leave to withdraw as Mr. Osterweil's attorney.  He has since informed me that you will now be representing plaintiff.  As such, I now renew the City's request to withdraw his complaint or to otherwise respond by May 21, 2012. If plaintiff fails to do so, defendant City intends to move the Court to impose sanctions and costs pursuant to Rule 11(c)(2) for the reasons set forth below.

       A pleading violates Rule 11 where "after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or good faith argument for the extension, modification or reversal of existing law." Jacques v. Dimarzio, 216 F. Supp. 2d 139, 143 (E.D.N.Y. 2002)(citations omitted); FED. R. CIV. P. 11(b).  "Since the inquiry must be reasonable under the circumstances, liability for Rule 11 violations requires only a showing of objective unreasonableness on the part of the attorney or client signing the papers." ATSI Communs., Inc. v. Shaar Fund, Ltd., 579 F.3d 143, 150 (2d Cir. 2009) (internal quotations omitted); see also Mover's & Warehouseman's Ass'n of Greater New York v. Long Island Moving & Storage Ass'n Inc., et al., 98 Civ. 5373, 1999 U.S. Dist. LEXIS 20667, at *24 (E.D.N.Y. Dec. 27, 1999) (declaring that, when it is objectively obvious that plaintiff's counsel engaged in little or no preliminary factual and legal investigation before filing

a pleading, sanctions are warranted). Bad faith on the attorney's part is not a necessary element for the imposition of sanctions and costs. Id. Notably, "[a] statement of fact can give rise to the imposition of sanctions only when the particular allegation is utterly lacking in support." Kiobel v. Millson, 592 F.3d 78, 81 (2d Cir. 2010) (internal quotations omitted).

Here, plaintiff asserts a number of claims arising out of his arrest on October 1, 2011 on the Brooklyn Bridge. Plaintiff claims in paragraph 11 of the complaint that on October 1, 2011 at approximately 3 p.m. he was "walking from his home in Brooklyn towards Manhattan on the Brooklyn Bridge in the area designated for pedestrians." He further alleges in paragraph 13 of the complaint that he was "arrested alongwith (sic) other arrestees who were purportedly part of the Occupy Wall Street protest group" and he "was not part of this group but yet the defendants arrested him for lawfully being on the pedestrian walkway of the Brooklyn Bridge." A simple Google search of plaintiff's name brings up a document authored by plaintiff just days after the incident, at http://www.shareable.net/blog/the-battle-of-brooklyn-bridge, a copy of which is annexed hereto. In said post, plaintiff writes about the October 1, 2011 Brooklyn Bridge march, "In the roadbed, filling the Brooklyn bound lane with traffic, we screamed and jumped and took in the view. And not the view from the narrow, raised central walkway, where there isn't nearly enough room for the tourists and bikers to coexist, where recently ten-foot high metal construction barriers have blocked the skyline. We were right up against the edge." Plaintiff further writes about "Those of us running up the Brooklyn Bridge, those of us who for one glorious hour held it, occupied it with 1000 of our closest friends." This post belies the allegation that plaintiff was "on the pedestrian walkway" and that he "was not part of the group."

Had counsel for plaintiff conducted a reasonable investigation, he would have learned that the "facts" as recited in the complaint are clearly spurious, and plaintiff in fact admitted he was part of the group that "took the bridge" by walking on the roadway of the Brooklyn Bridge on October 1, 2011, despite hearing warnings given by a police lieutenant, announcing protesters' imminent arrest if they didn't clear the road, which were ignored.

In view of the foregoing, plaintiff's claims are not factually viable. Consequently, the City of New York requests that plaintiff voluntarily withdraw his complaint, or otherwise respond to this letter, by May 21, 2012. If plaintiff fails to do so, the City intends to move for sanctions and costs under Rule 11 for failing to conduct an objectively reasonable inquiry concerning the allegations in the complaint.

Very truly yours,

Dara L. Weiss
Senior Counsel
Special Federal Litigation Division

Attachment

REGISTER FOR FREE! / LOGIN

# :CITIES

SEARCH SITE →

MOST RECENT ⬇   TOP TAGS:   VIDEOS   DIY   HOW TO SHARE   FEATURES   COLLABORATIVE CONSUMPTION   COMMONS   SHARING

## The Battle of Brooklyn Bridge

 By Willie Osterweil
10.04.11, 12:23pm | Comments (1)       Like   37       Tweet   22       <

Select Language ▼



(via wikimedia)

"Whose Bridge?" "Our Bridge!" "Whose Bridge?" "Our Bridge!"

For one hour on Saturday, the bridge belonged to the people. 1000 protesters spilled over its roadway while another 1000 marched across the pedestrian walkway. In the roadbed, filling the Brooklyn bound lane with traffic, we screamed and jumped and took in the view. And not the view from the narrow, raised central walkway, where there isn't nearly enough room for the tourists and bikers to coexist, where recently ten-foot high metal construction barriers have blocked the skyline. We were right up against the edge.

For the next four hours on Saturday, the bridge belonged to the NYPD. Setting a line of police vehicles and orange netting at the center of the bridge, and coming up behind us with patrol vans and paddy wagons, they kettled us. Some protesters, quick enough and closer to the center, scaled the bridge posts onto the safety of the walkway ten feet above, but cops soon pushed through the northeast side of the lane, separating us from escape. One by one, violently at first, then, as the reality of our position became clear, smoothly, they arrested us. The NYPD spent four hours arresting 700-plus people.

We were put in plastic cuffs and sat down behind the police barricades, where an "arresting officer" was assigned to every five protesters -- from then on we would be transported and processed in groups of five, getting in and out of jail at the same time, a little sub-unit of solidarity. Some of us were put in police vans and buses, but most were transported, like I was, in requisitioned MTA buses. Ours was a B41, which normally runs right by my apartment, driven by an MTA bus driver—a coerced union transportation worker, not a cop—who said while we rolled out: "It feels like the 60's again!" to raucous applause. Arms aching restrained behind us, sitting on the hard plastic seats, cops standing over us looking bored, with our eyes at their waists, looking at their guns and pepper spray, this was the commute *par excellence*.

There is no single precinct jail with capacity for 700 prisoners, so protesters were spread in jails across Manhattan and Brooklyn. The buses functioned as holding cells while the police prepared intake- mobile arrest pens where we sat for hours needing to pee and stretch our arms and legs—but for most of us that was the worst of it. "Arresting officers" didn't get to leave until "their" five arrestees were processed, so we sat in jail talking, chanting, singing, sleeping, or staring sullenly at our feet while they filled out paperwork until two, three, four in the morning. Those of us with ID and without warrants were given a Bench Summons for Disorderly Conduct and released the same night- those without ID were released throughout the day Sunday. Though a couple

### RELATED ARTICLES

- You're Invited to SHARE New York
- Occupy as a New Societal Model & Ways to Improve It
- Policies for a Shareable City
- Occupy Wall Street's Consensus Process [VIDEO]
- More Than Books: Libraries Strengthen Communities in Uncertain Times
- Authors, Publishers and Supporters React to the Seizure of the People's Library
- Policies for a Shareable City #1: Car Sharing and Parking Sharing
- Louisville on My Mind
- Recap From SHARE NY
- How to Be an Urban Change Agent, Shareable Style

 How Can We Practice Sharing, Organizing, and Creating in Ways That Transform Ourselves, Our Communities, and the World?
By Caroline Woolard

 Speed Neighboring: One Way To Repel The Attack On Sharing
By Randy White

 Bibliophiles
By Heather Vila

 Build a New Economy for the Cost of a Coffee? Pt. 2
By Drew Little

 Trade School: Pay Teachers with Groceries, Art & Advice
By Caroline Woolard

 Transplant
By Heather Vila

 Build a New Economy for the Cost of a Coffee? Pt. 1
By Drew Little

 Differentiating The Anarcho Economy From The Sharing Economy
By Randy White

 Cultivating a Sustainable Community: The Cycle of Collaboration
By Brad Smith and Barbara Wishingrad

 A Collaborative Economy in a Centralized Country?
By Shabnam Anvar

- In regards to citations for 20 min 21 sec ago
- I mean pushing for war in 1 hour 29 min ago
- Hi Andrew, I should have read

2 hours 10 min ago
● As the Obama administration
2 hours 27 min ago
● Neal, thanks for weighing in.
2 hours 46 min ago

more

protesters with outstanding warrants stayed longer, many protesters with, shall we say, pressing legal issues got through unscathed. We overwhelmed them: the cops just didn't have the capacity to properly sort us. Charges would've been disastrous, but there were too many, and as a result, barely any misdemeanor charges (let alone felonies).

But for all that happened, the stories parsing the meaning of Saturday's events have focused around one ten-minute stretch: the moment at which people deviated from the pre-planned walk across the pedestrian path and took the roadway. Two stories are being told. Story one claims that the police instigated and tricked protesters onto the road, luring them with a combination of obviously weak policing and agent provocateurs in order to entrap and arrest them. The idea that cops led protesters onto the bridge has largely been supported by this video, which shows police walking ahead of protesters as they enter the onramp and has been interpreted as cops leading the march.

Story two has the protesters stop their march at the base of the on-ramp to make a choice. The police warn them to get out of the road, but a group of protesters in the front decide to link arms and take the bridge anyway. The lieutenants, not expecting this radical action, back off, and protesters march onto the bridge with cops fleeing ahead of them. This argument has been supported by this video, in which a lieutenant, announcing protesters' immanent arrest if they don't clear the road, is ignored and drowned out by marchers' cries.



In story one, the NYPD are brilliant tacticians, controlling and understanding the protesters perfectly. Despite this total knowledge, however, they are so filled with spite for the protesters that they are willing to shut down the Brooklyn Bridge for five hours in order to arrest them, resulting media coverage be damned. They're supposedly both super-villain brilliant and obsessively idiotic. In story two, the police are unprepared and overwhelmed. Expecting the protesters to cross legally, the majority of the police force was amassed on the Brooklyn side. When protesters took the bridge, the Brass panicked and locked down the bridge. They arrested everyone, believing it better than appearing unable to control the situation, revealing themselves as reactive, arrogant, and tactically mediocre.

In the first story, the protesters are foolish, misled and chaotic, unable to recognize that they're being led by the police to certain arrest. Idealistic but stupid, fatally infiltrated by provocateurs, they bumble away from the planned peaceful march into disaster. Despite their total idiocy, this narrative maintains that these innocents are the very center of the police's universe, the total focus of their actions. In story two, the protesters recognize their own strength, the power-and-attention-amplifying value of disrupting infrastructure and the potential fun of occupying the bridge. They overcome their fear of the police and their fear of the impossible, and seize their own freedom, even if just for an hour.

The protesters should clearly be telling story two, and not just because it's what actually happened. But instead, they've mostly told the former. Why? The generous explanation is a knee-jerk dismissal of mainstream media and police narratives, which is certainly present, but there are worse motives for the propagation of the cop-control story. Politically repressive or vanguardist, power hungry or critically feeble: despite all disavowal, power has centralized around certain figures within Occupy Wall Street's committees, and when

power centralizes, its bureaucrats always try to hold onto it. So organizers blame the other side, albeit with a blatantly bizarre explanation (The cops really wanted to shut down the Brooklyn Bridge and arrest 700 people? Their whole job is to keep infrastructure functioning.) Organizers, upset over the loss of control of the march and behaving identically to police upset over loss of control of the bridge, blame the other side. Each side argues that their own weakness took the day.

Those of us running up the Brooklyn Bridge, those of us who for one glorious hour held it, occupied it with 1000 of our closest friends, we weren't manipulated by police: we just decided we'd take a walk on the bridge. Everyone focuses on the arrests, on the drama, but most people fail to mention just how easy it is to take something over when there are 700 of you. 1000 people can walk anywhere they want, and, if they do it right, do anything they please. It's when the cops are trying and failing to arrest 1000 of us that things are going to get really interesting.

TAGS: OCCUPY WALL STREET, VIDEOS

 

Rate this article

Your rating: None Average: 4 (4 votes)

## We Recommend

Is Happiness The New Online Currency?

SXSW Liveblog: The Airbnb of Anything: The Growth of P2P Markets

Dog Parks, Humans and the Commons

Speed Neighboring: One Way To Repel The Attack On Sharing

Occupy The War Machine

## From around the web

The 30 Most Unforgivable Betrayals in Sports (BleacherReport)

Say Goodbye to Fast Ethernet (CIO)

SSDs Have 'Bleak' Future, Researchers Say (PC World)

Increase a home network's speed (Computer Active)

Honda Accord Reviews | New Honda Accord 2.0 (Auto Express)

[?]

## Comments

 Samuel Greenlee wrote on 10.05.11, 9:18am:

Willie,
I appreciate your thoughtfulness on this issue and your resistance to new forms of bureaucratic corruption, even among protesters. Could you please do a follow-up, though, explaining the reasoning behind the protest on the bridge? I don't understand the reasoning behind shutting down an important traffic artery and causing a headache for the people (most of whom would not have been Wall Street fat-cats) trying to get home or to work as a protest against corporate greed and corruption.
Thanks,
Sam

-Sam
http://leakyjar.wordpress.com
@SamuelGreenlee